[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12004
Non-Argument Calendar

_____

D.C. Docket No. 2:11-cv-00116-JES-DNF

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

versus

RADIUS CAPITAL CORP.,

Defendant,

ROBERT A. DIGIORGIO,

Defendant-Appellant,

THOMAS DOTSON,

Material Witness,

GOVERNMENT NATIONAL MORTGAGE ASSOC., et al.,

Third-Party Custodians.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 29, 2016)

Before TJOFLAT, JORDAN and JILL PRYOR, Circuit Judges.

PER CURIAM:

The Securities and Exchange Commission sued Robert A. DiGiorgio and his company, Radius Capital Corporation, under § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a),  § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b–5, 17 C.F.R. § 240.10b–5. After a nine-day trial, the jury found in favor of the SEC on all claims. The district court then enjoined Mr. DiGiorgio from committing further violations of the antifraud statutes and regulations, ordered that he disgorge his gains, and imposed a civil penalty of $1.29 million. Mr. DiGiorgio, proceeding *pro se*, now appeals.

**I**

Mr. DiGiorgio is the founder and CEO of Radius, a mortgage lender and issuer of mortgage-backed securities (MBS). The Government National Mortgage Association (Ginnie Mae) is a governmental corporation that guarantees the payment of approved MBS issued by private lenders. A Ginnie Mae guarantee requires that the loans underlying the MBS be insured by the Federal Housing Administration or be eligible for FHA insurance. When a Ginnie Mae-guaranteed MBS is sold to investors, the homeowners' monthly principal and interest payments are "passed-through" from the issuer to the purchasers of the MBS. If one of the underlying loans enters into default, the issuer can either step in and

2

continue the pass-through payments or request approval from Ginnie Mae to prepay the outstanding principal to remove the defaulted loan from the pool. If the issuer fails to do either, Ginnie Mae—having guaranteed the MBS—makes the required payment.

Radius and Mr. DiGiorgio sought to obtain Ginnie Mae guarantees for the MBS it issued. To do so, they completed an "Application for Approval" to become a Ginnie Mae approved issuer, a "Schedule of Subscribers" and "Ginnie Mae Guaranty Agreement" (Form 11705), and a Schedule of Pooled Mortgages (Form 11706). They then submitted the completed forms through Ginnie Mae's GinnieNET system. Both the Application and Form 11705 require the issuer to warrant that the underlying loans are eligible for a Ginnie Mae guarantee under § 306(g) of the National Housing Act, 12 U.S.C. § 1721(g). Form 11706 is a fill-in-the-blank document in which the issuer provides information about each loan, including, in this case, an FHA loan case number.

The SEC claimed that, from December of 2005 to October of 2006, Radius issued and sold at least 15 MBS at a value of over $23 million, for a profit of $1 million. Eventually, the loans underlying Radius' MBS fell into default, and in October of 2006, Radius defaulted on its pass-through payments to investors. Ginnie Mae then prepaid the remaining principal on the defaulting loans and removed them from the respective pools. As a result, investors who had purchased

3

the MBS did not receive the expected interest payments, and because the loans were not FHA-insured, Ginnie Mae did not recover the prepayment amount and suffered more than $5 million in losses.

The SEC brought a civil enforcement action against Mr. DiGiorgio and Radius asserting two claims: Count I alleged violations of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); and Count II alleged violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), through Exchange Act Rule 10b–5, 17 C.F.R. § 240.10b–5. The SEC sought injunctive relief, disgorgement of profits, and the imposition of civil penalties. Radius did not answer the complaint, and the district court entered a default judgment against it.

The SEC alleged that misrepresentations were present both in the GinnieNET forms and in the prospectuses that were made available to the public by download via Ginnie Mae's website, or through an investor's brokerage. With respect to the GinnieNET forms, the SEC alleged that, despite knowing that the majority of the loans did not meet FHA insurability standards, Radius and Mr. DiGiorgio falsely represented the loans were FHA insured (or were eligible for FHA insurance) on Forms 11705 and 11706. In fact, the SEC claimed, many of the loans contained or involved invalid social security numbers, inflated appraisals, falsified employment and income documentation, straw-man purchases, and violations of anti-flipping prohibitions. All in all, according to the SEC, roughly

4

70% of the underlying loans did not meet FHA insurability standards. As for the prospectuses, based on the information submitted by Mr. DiGiorgio, they indicated that Radius had certified that the mortgages in the MBS were eligible for FHA insurance.

Mr. DiGiorgio filed a counseled motion to dismiss the civil enforcement action pursuant to Fed. R. Civ. P. 12(b)(6). Before the district court ruled on the motion, Mr. DiGiorgio's attorneys withdrew as counsel, and Mr. DiGiorgio continued *pro se*. The district court denied the motion to dismiss in part and granted it in part. It held that some of the claims based on the prospectuses did not meet the particularity requirement of Fed. R. Civ. P. 9(b) for liability under Rule 10b–5(b). Specifically, the district court found that Rule 10b–5(b) required that Mr. DiGiorgio have "made" the false statements in the prospectuses, and the complaint failed to sufficiently plead that Radius or Mr. DiGiorgio had ultimate control over the message in the prospectuses. The district court denied the motion to dismiss in all other respects.

Before trial, Mr. DiGiorgio filed a motion for summary judgment. The district court denied that motion. Mr. DiGiorgio also filed various motions *in limine* that sought to prohibit the admission at trial of the application, the GinnieNET forms, and the prospectuses. The district court denied these motions as well.

5

Mr. DiGiorgio then submitted proposed jury instructions that would require the jury to find that the alleged material misrepresentations had been made to public investors. Before the trial's conclusion, Mr. DiGiorgio moved for a special limiting instruction that would require, once again, the jury to find that the material misrepresentations had been publicly disseminated. The final jury instructions did not contain the requested language, the district court did not issue the requested limiting instruction, and Mr. DiGiorgio did not object to the final jury instructions. The jury found Mr. DiGiorgio liable on all claims asserted by the SEC. Mr. DiGiorgio filed a motion for a new trial, which the district court denied.

## II

We liberally construe *pro se* briefs and hold them to a less stringent standard than those drafted by attorneys, nevertheless, issues not raised below are still deemed forfeited. *See Timson v. Sampson,* 518 F.3d 870, 874 (11th Cir. 2008).

Mr. DiGiorgio raises numerous matters of law and fact on appeal. For clarity, we frame the issues as Mr. DiGiorgio appealing the district court's (1) rulings on statutory interpretation, (2) denial of his objection to the admission of evidence, (3) denial of his proposed jury instructions and jury verdict form, and (4) denial of his motion for a new trial.

6

## III

Questions of statutory interpretation are reviewed *de novo*. *See Moore v. Appliance Direct, Inc.*, 708 F.3d 1233, 1237 (11th Cir. 2013).

Establishing a violation of Rule 10b–5 requires proof that the defendant made (1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) with scienter. *See SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007). Proving a violation of § 17(a)(1) requires substantially similar proof: "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter." *Id.* To establish a violation of § 17(a)(2) or (3), the SEC need only show that the first two elements of § 17(a)(1) were committed with negligence. *Id.* Finally, the "in connection with the purchase or sale of" and "in the offer or sale of" elements of Rule 10b–5 and § 17(a) can be interchangeable. *See United States v. Naftalin,* 441 U.S. 768, 773 n.4 (1979).

## A

We first address Mr. DiGiorgio's argument that § 17(a) and Rule 10b–5 require that a material misrepresentation "be disseminated into the public arena, [and that the] exact misrepresentation . . . be an attempted communication directly at the potential investing public" to be "in connection with the purchase or sale" or "in the offer or sale" of any security. Mr. DiGiorgio maintains that § 17(a) and

7

Rule 10b–5 do not cover misrepresentations made to Ginnie Mae because, as a non-market participant, it was not involved in any security transaction. Because his alleged misrepresentations were only disseminated to Ginnie Mae, Mr. DiGiorgio argues that as a matter of law he cannot be held liable under either § 17(a) or Rule 10b–5.

The Supreme Court has counseled that the "in the offer or sale of" requirement of § 17(a) is to be read broadly because the 1933 Securities Act was intended not just to protect investors, but also "to achieve a high standard of business ethics . . . in every facet of the securities industry." *Naftalin*, 441 U.S. at 773–75. In *Naftalin*, the defendant identified stocks that he felt would quickly lose value, falsely represented to brokers that he owned shares of the stocks, and placed orders with them to sell those shares. *Id*. at 768. Assuming that the stocks' value would fall quickly enough that he would be able to purchase the same stocks at a lower value before the securities had to be delivered, he planned to keep the difference in value as profit. *Id.* Instead, the stocks' value rose, and the brokers were unable to deliver the securities to investors who had purchased them. *Id*. Rejecting the defendant's argument that "in the offer or sale of" any security referred solely to transactions with the investing public, the Supreme Court ruled that "the statutory terms . . . are expansive enough to encompass the entire selling process." *Id.* at 773. Because "frauds perpetrated upon either business or investors

8

can redound to the detriment of the other and to the economy as a whole" the Court ruled that placing financial intermediaries "outside the aegis of § 17(a) would create a loophole in the statutes that Congress simply did not intend to create." *Id.* at 776–77.

In the years following *Naftalin*, the Supreme Court has rejected a narrow interpretation of the "in connection with" and "in the offer or sale of" requirements in SEC civil enforcement actions. *See S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) ("[W]e have explained that the statute should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.") (internal citations omitted). *See also Superintendent of Ins. of State of N. Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 9 (1971) (holding that a violation of Rule 10b–5 can occur even when the deception does not occur alongside the purchase or sale of securities). And we have held that misrepresentations need not be concomitant with a transaction involving public investors. *See S.E.C. v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982) ("The Securities Act of 1933 must be interpreted broadly by the courts in order to effectuate the Congressional intent to protect investors.").

To sell stock, the defendants in *Carriba* filed a registration statement with the SEC that contained misrepresentations and omissions. *Id.* at 1320. As part of an initial private placement of securities, the defendants reviewed and approved a

private placement memorandum that contained the misstatements and omissions they had made in the registration statement. *Id.* Later, as part of the public offering, the defendants reviewed and approved a final prospectus that contained the same misrepresentations and omissions. *Id.* The district court found that the defendants had violated § 17(a) and Rule 10b–5 and imposed a preliminary injunction. *Id.* at 1320. We affirmed, explaining that the defendants blatantly violated the securities laws when they "knowingly made material misrepresentations and at least recklessly made material omissions on documents submitted to the SEC." *Id.* at 1322.

Since *Carriba*, we have continued to read the terms "in connection with the purchase or sale of" and "in the offer or sale of" broadly. We have upheld summary judgment against defendants who misstated their company's revenue in periodic reports, SEC filings, and press releases, and then raised over $10 million from the sale of company stock, finding that they committed "deceptive acts as part of a scheme to generate fictitious revenue." *S.E.C. v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014). And we have explained that the "in connection with" requirement is satisfied where the fraud "touch[es]" the transaction in some way, including situations where "the purchase or sale of a security and the [preceding] proscribed conduct are part of the same fraudulent scheme." *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1046 (11th Cir. 1986) (internal citations omitted).

10

Mr. DiGiorgio cites the Supreme Court's decision in *Chadbourne & Parke LLP v. Troice*, 134 S.Ct. 1058 (2014), for the proposition that misrepresentations must be material to a purchasing decision by one or more public investors to meet the "in connection with" and "in the offer or sale of" requirements. Mr. DiGiorgio argues that *Chadbourne & Parke* requires that misrepresentations be publicly disseminated. That case, however, involved a private action, which requires actual reliance by the person defrauded. *See id.* at 1062–63. An SEC civil enforcement action does not. *See id.* In *Chadbourne & Parke*, the Supreme Court specifically noted that although actual reliance is necessary for a private action under the Securities Litigation Uniform Standards Act of 1998 (SLUSA), 15 U.S.C. §78bb(f)(1), its holding did "*not* limit the Federal Government's authority to prosecute" frauds where there was no actual reliance. *Id.* at 1062. In a case before *Chadbourne & Parke*, we too had recognized this "important distinction" between private actions and SEC enforcement actions. *See S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1244 (11th Cir. 2012).

Given these authorities, we conclude that the misrepresentations themselves need not be explicitly directed at the investing public or occur during the transaction to be "in connection with the purchase or sale of" or "in the offer or sale of" any security. We therefore reject Mr. DiGiorgio's contrary argument.

11

**B**

Mr. DiGiorgio next asserts that all § 17(a) and Rule 10b–5 subsections require that he be the person who "made" the misrepresentations in the prospectuses. The district court ruled that, under *Janus Capital Grp., Inc. v. First Derivative Traders,* 131 S. Ct. 2296 (2011), the SEC must allege facts showing that a defendant had "ultimate authority over the statement, including its content and whether and how to communicate it." *See id*. at 2302. Because the SEC failed to make such allegations regarding the prospectuses, the district court concluded that the complaint did not meet the Rule 9(b) particularity requirement and dismissed the prospectus-based Rule 10b–5(b) claims.

On appeal, Mr. DiGiorgio relies on *S.E.C. v. Kelly*, 817 F. Supp.2d 340, 345 (S.D.N.Y. 2011), where the district court ruled that all the § 17(a) and Rule 10b–5 subsections required a defendant to be the maker of the misrepresentations. Because the district court applied the *Janus* requirement only to Rule 10b–5(b), Mr. DiGiorgio contends, it erred in failing to dismiss the civil enforcement claims in their entirety.

The law in this circuit, however, is clear: the requirement that the defendant be the "maker" of the misrepresentations on a document only applies to Rule 10b–5(b). *See S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 795 (11th Cir. 2015). As we said in *Big Apple*:

12

> Rule 10b–5 subsections (a) and (c) . . . like § 17(a) subsections (1) and (3), prohibit schemes to defraud and fraudulent courses of business, respectively. However, subsections (1) and (3) in § 17(a) and subsections (a) and (c) in Rule 10b–5 do not use the word "make" or even address misstatements. The Court in *Janus* interpreted what it means to "make" a misrepresentation under subsection (b) of Rule 10b–5. Thus, any attempts by the defendants to import the Court's narrow holding to the entirety of § 17(a) is untenable on its face.

*Big Apple*, 783 F.3d at 796.

Based on *Big Apple*, we conclude that the requirement that a defendant "make" the misrepresentations is limited to Rule 10b–5(b) claims, and reject Mr. DiGiorgio's argument as to § 17(a).

## IV

We review a district court's ruling on the admissibility of evidence deferentially under an abuse of discretion standard. *See Goldsmith v. Bagby Elevator Co. Inc.*, 513 F.3d 1261, 1276 (11th Cir. 2008). The district court has wide discretion in admitting or denying the admission of evidence, and we will overturn an evidentiary ruling only if the movant establishes that (1) the district court made a clear error of judgment or applied the wrong legal standard and (2) the ruling caused a "substantial prejudicial effect." *Burchfield v. CSX Transp., Inc.,* 636 F.3d 1330, 1333 (11th Cir. 2011) (internal citation omitted).

Mr. DiGiorgio contests the district court's admission of both the GinnieNet forms and the prospectuses. Though Mr. DiGiorgio does not explicitly use any rule

13

of evidence to frame his claim, we construe his argument as having two bases. First, because the documents—and accordingly the misrepresentations—were not publicly disseminated, they could not have been material to any investor's decision, so they are not relevant. Second, the admission of the prospectuses was substantially prejudicial because it then became impossible for the defense to argue that the prospectuses did not influence the investors.

The materiality of a misrepresentation in the antifraud context is an objective determination, *Merch. Capital*, 483 F.3d at 766, so a lack of dissemination is immaterial. In this case, moreover, the finalized documents were at the core of the enforcement action because they were the repositories for Mr. DiGiorgio's misrepresentations. The GinnieNET forms and prospectuses are relevant because they tend to make it more likely that Mr. DiGiorgio made or used misrepresentations to obtain a Ginnie Mae guarantee for his MBS, which he then sold. *See* Fed. R. Evid. 401. For the same reason, whatever unfair prejudice Mr. DiGiorgio alleges to have suffered from the documents' admission does not substantially outweigh their probative value. *See* Fed. R. Evid. 403. In short, the district court did not abuse its discretion in admitting the documents into evidence.

## V

We generally require that a party object to jury instructions or a jury verdict form before the jury begins deliberations. *See Farley v. Nationwide Mut. Ins. Co.*,

14

197 F.3d 1322, 1329 (11th Cir. 1999).  When a party, like Mr. DiGiorgio here, fails to timely object, we review for plain error. *Id.* To succeed under this "extremely stringent form of review," a party must prove four elements: (1) that an error occurred, (2) that the error was plain, (3) that it affected substantial rights, and (4) that not correcting the error would seriously affect the fairness of the proceedings. *Id*. In short, we only reverse when an error of law is so prejudicial that it "affected the outcome of the proceedings." *Id.* at 1330.

Mr. DiGiorgio alleges that the final jury instructions and verdict form constituted plain error because the district court denied his motion for a limiting instruction, and the final jury instructions did not require the jury to find that the misrepresentations were publicly disseminated. Because dissemination is not a legal prerequisite to liability under § 17(a) and Rule 10b–5, we find no plain error.

Mr. DiGiorgio also claims that the instructions were vague because they did not specify that the Rule 10b–5(b) claim regarding the prospectuses had been dismissed, and the jury therefore improperly deliberated on that charge. We disagree. The jury found that there was sufficient evidence to find Mr. DiGiorgio liable on all counts under all the other subsections of § 17(a) and Rule 10b–5. Assuming the jury considered whether Mr. DiGiorgio "made" the misrepresentations in the prospectuses, there is no evidence this affected its decision regarding whether he "made" misrepresentations in the GinnieNET forms.

15

Even if the jury had found for Mr. DiGiorgio as to the prospectuses, it could still have returned a verdict for the SEC on all counts because the evidence that Mr. DiGiorgio "made" the misrepresentations on the GinnieNET forms was considerably stronger—not only did he misrepresent the FHA eligibility on the forms, but he also included invalid social security numbers, falsified income information, etc. Because there is no evidence that the jury instructions affected the outcome of the proceedings, we find no plain error.

## VI

We review a district court's denial of a motion for new trial for abuse of discretion. *See Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir.2001).  A motion for a new trial based on evidentiary sufficiency should be granted only if the verdict is against the great weight of the evidence. *Id*. Great deference "is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed." *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1498 (11th Cir. 1987).

Mr. DiGiorgio raises various questions of fact with respect to the verdict: whether the statements he made on the GinnieNET forms were false assertions or honest opinions; whether the Radius loans were eligible for FHA insurance; and whether the misrepresentations or omissions were "in connection with the purchase or sale of" or "in the offer or sale of" the MBS. Mr. DiGiorgio also recharacterizes

16

his dissemination argument into one of factual sufficiency by asserting that, on this record, any misstatements in the GinnieNET forms were not material because they had not been disseminated to the public. He also claims that he lacked the necessary scienter and offers as evidence the fact that he did not disseminate the forms or prospectuses. Both scienter and materiality are mixed questions of law and fact and are generally within the province of the jury. *See Merch. Capital,* 483 F.3d at 766.

Mr. DiGiorgio first points to the declaration of James Hodgins, a former securities broker at Wachovia Securities—one of the entities that purchased the Radius MBS. In his declaration, Mr. Hodgins stated that, because the Radius MBS were backed by Ginnie Mae, the quality of the underlying loans was irrelevant to him. But again, the test for materiality in an SEC civil enforcement action is objective, and asks "whether a reasonable man would attach importance to the fact misrepresented" when deciding whether to purchase the security. *Merch. Capital*, 483 F.3d at 766.  If a borrower defaults and the loans are paid back before maturity, the MBS investor loses the interest payments remaining on the life of the loan. On this point, there is evidence that Ginnie Mae-guaranteed MBS are attractive to investors, in part, because the underlying loans' quality lessens the risk that the borrowers will default. Consequently, we find that the jury's verdict was not against the great weight of the evidence.

17

Mr. DiGiorgio next claims that that he lacked the necessary scienter in making the alleged misrepresentations. As proof, he asserts that he never disseminated the GinnieNET forms to the public. Moreover, Mr. DiGiorgio claims that he was unaware of the prospectuses' existence—and consequently did not distribute them—because the MBS were exempt from the antifraud and registration. *See* 15 U.S.C. §77c(a)(2) and d(a)(2); 17 C.F.R. § 230.500(a). Or, at least he says he believed they were. For these reasons, he argues that he could not have had the necessary scienter under § 17(a) or Rule 10b–5.

We note first that though the MBS are exempt from registration requirements, they are not exempt from the antifraud provisions of § 17(a), § 10(b), and Rule 10b–5. In addition, we do not require actual knowledge to establish scienter under § 17(a)(1) or Rule 10b–5. *See Monterosso*, 756 F.3d at 1335 (scienter can "be established by a showing of knowing misconduct or severe recklessness."). Lastly, § 17(a)(2) and § 17(a)(3) only require negligence. *Id.* at 1334.

Here we conclude that the jury's verdict was not against the great weight of the evidence. The type of false information on the GinnieNET forms—e.g., invalid social security numbers, false case numbers, and falsified employment information—was quite particular. In addition, seventy percent of the underlying loans did not meet FHA insurability standards. There is also evidence that, as the

CEO and sole officer of Radius, Mr. DiGiorgio instructed his employees to make loans that fell below FHA requirements and overruled employees who refused to do so. In sum, he was in control of Radius' operations. With respect to the prospectuses, as we have noted, the district court dismissed the Rule 10b–5(b) claim that required Mr. DiGiorgio to have "made" the misrepresentations on the prospectuses themselves. Thus, whether Mr. DiGiorgio created, knew of, or distributed the prospectuses is inconsequential because the information in the prospectuses was based on the misrepresentations he had made on GinnieNET forms.

Having already expounded on the substantial amount of evidence against Mr. DiGiorgio, we affirm the district court's denial of his motion for a new trial.

## VII

We affirm the district court's legal interpretation of § 17(a) and Rule 10b–5, denial of Mr. DiGiorgio's objection to the admission of evidence, denial of Mr. DiGiorgio's proposed jury instructions and jury verdict form, and denial of Mr. DiGiorgio's motion for a new trial.

**AFFIRMED.**

19